158 Ill. App.3d 478 (1987)
511 N.E.2d 1206
AMERICAN NATIONAL BANK & TRUST COMPANY OF CHICAGO, Special Adm'r of the Estate of Ruth A. Alsup, Deceased, et al., Plaintiffs-Appellants,
v.
LARRY G. THOMPSON et al., Defendants-Appellees.
No. 85-3232.
Illinois Appellate Court  First District (1st Division).
Opinion filed June 29, 1987.
Rehearing denied August 18, 1987.
*479 Rosin, Rosin & Associates, Ltd., of Chicago (Joseph A. Rosin, of counsel), for appellants.
Williams & Montgomery, Ltd., of Chicago (Barry L. Kroll, James K. Horstman, Jeffrey H. Lipe, and C. Barry Montgomery, of counsel), for appellees.
Judgment affirmed.
PRESIDING JUSTICE QUINLAN delivered the opinion of the court:
Ruth Alsup died when an automobile in which she was riding as a passenger collided with a semitruck on Route 36 in Macon County, Illinois. The administrator of the decedent's estate, American National Bank and Trust Co., brought this wrongful death action against the owner of the truck (Consolidated Freightways Corp. of Delaware), the driver of the truck (Larry Thompson), and the driver of the automobile (Nancy Nielsen, n/k/a Nancy Miller). A jury found all defendants liable *480 and determined that the pecuniary loss sustained by the decedent's surviving daughter was $150,000; thereafter the court entered judgment in that amount on the wrongful death action. A separate action for personal injury damages maintained on behalf of Amy Alsup, decedent's daughter, who was a rear seat passenger in the Nielsen car, resulted in a $5,000 judgment in her favor. No error is asserted regarding this award. Following the denial of plaintiff's post-trial motion in the wrongful death action, the plaintiff filed this appeal requesting a new trial on damages.
The issues presented in this appeal are: (1) whether the testimony of defendant's expert concerning the present cash value of decedent's future income should have been stricken in its entirety; (2) whether the exhibits which defendant's expert used to explain present case value should have been excluded from evidence; (3) whether defense counsel committed prejudicial error by presenting the Biblical parable of the Good Samaritan in his closing argument; and (4) whether the monetary award returned by the jury in the amount of $150,000 for the wrongful death of Ruth Alsup was so inadequate that a new trial was required on the issue of damages.
The record reveals the following pertinent facts upon which the jury's verdict is based. On the afternoon of February 10, 1975, the decedent, Ruth Alsup, was riding as a front seat passenger in a car driven by Nancy Nielsen, n/k/a Nancy Miller. Amy, Ruth's daughter, was riding in the backseat. The Nielsen vehicle was traveling eastbound on Route 36. Some distance ahead of the Nielsen vehicle a semitruck driven by Larry Thompson was also traveling eastbound on Route 36. Shortly after the Nielsen car passed over the crest of the hill on Route 36, it collided with the back end of the truck, and Ruth Alsup was killed and Amy Alsup was injured.
At trial, Larry Thompson, the driver of the truck, testified that when he reached the top of the rise just west of the accident scene, he saw a car one-half mile ahead of him slow down and pull off the roadway. At that time, he took his foot off the accelerator and activated his four-way lights. As he approached the stalled car, he applied his brakes and came to a stop on the roadway. As Thompson slowed to a stop, he automatically checked his rearview mirror, but saw no traffic close enough behind him to warrant his attention. From the location where he stopped, Thompson had an unobstructed view of about one-half mile behind him.
Thompson testified that his reason for stopping was to help the woman in the stalled vehicle. He could not call for help, he said, because his CB radio had not been operating properly and was disconnected. *481 He also stated that he could not pull his truck-trailer off the roadway because he would have become mired in the muddy shoulder and probably would have, in his opinion, tipped over. After the truck had come to a full stop, Thompson set the emergency brake and again looked into his rearview mirror. Prior to the impact, he saw the Nielsen vehicle 10 or 20 feet behind behind the truck. He had not seen the Nielsen vehicle at any earlier point. According to Thompson's recollection, the interval between the time that Thompson stopped the truck and the time that Nielsen drove into the back of the truck was 5 or 10 seconds.
Elizabeth Digman, the driver whom Thompson had stopped to help, testified that her car's motor died and she skidded or steered into the ditch along the eastbound lane of Route 36. She stated that after the truck driver stopped to help her, approximately one-half minute elapsed before the Nielsen car collided with the back end of the truck. Mrs. Digman stated that at the time of the incident she was six or seven months pregnant.
Nancy Miller, the driver of the vehicle in which plaintiff's decedent was a passenger, testified that she had no recollection of the February 10, 1975, incident. There was no other testimony relating to the accident itself presented at the trial.
 1 Plaintiff's first contention on appeal is that the testimony of defendant's expert, Professor Edelstein, should have been stricken in its entirety for lack of relevance and lack of foundation. Specifically, plaintiff asserts that Professor Edelstein incorrectly defined and illustrated the term "present cash value." In response, defendant argues that the plaintiff's assertion results from plaintiff's fundamental confusion concerning what might be called an "economic" definition of present cash value as used by plaintiff's economist in his testimony and the "legal" definition utilized by defendant's mathematician, which was employed by the trial court in instructing the jury. The defendant asserts that this legal definition used by Professor Edelstein in his testimony is the same as that set forth in Illinois Pattern Jury Instruction, Civil, No. 34.05 (2d ed. 1971) (IPI Civil 2d), and is, thus, the only appropriate and correct definition of the term "present cash value" for purposes of determining proper damage awards in trial proceedings. We agree with the defendant's argument.
It is well established that damages for future losses must be reduced to their "present cash value" (see Allendorf v. Elgin, Joliet & Eastern Ry. Co. (1956), 8 Ill.2d 164, 133 N.E.2d 288; McCray v. Illinois Central R.R. Co. (1957), 12 Ill. App.2d 425, 139 N.E.2d 817; 22 Am.Jur.2d Damages sec. 26 (1965)), which has been defined as "the *482 sum of money needed now, which, together with what that sum will earn in the future, will equal the amounts of the pecuniary benefits at the times in the future when they would have been received." (IPI Civil 2d, No. 34.05; LeMaster v. Chicago Rock Island & Pacific R.R. (1976), 35 Ill. App.3d 1001, 1028, 343 N.E.2d 65; see also J. Francis, Investments: Analysis & Management 191 (3d ed. 1972); C. Goetz, Law & Economics 158-60 (1984).) The impetus for discounting future losses is to avoid giving the plaintiff a windfall, since money received today is invariably worth more than the same dollar amount received in the future. (See Chesapeake & Ohio Ry. v. Kelly (1916), 241 U.S. 485, 60 L.Ed. 1117, 36 S.Ct. 630; O'Shea v. Riverway Towing Co. (7th Cir.1982), 677 F.2d 1194, see also J. Francis, Investments: Analysis & Management 193 (3rd ed. 1972).) For example, one dollar received today can be invested in a 5% savings account and one dollar and five cents can be withdrawn in one year. Simply stated, the concept of present cash value accounts for the "time value" of money. J. Francis, Investments: Analysis & Management 193 (3d ed. 1972).
 2 In his testimony, the plaintiff's economist, Joel Mokyr, calculated the present cash value of the pecuniary loss sustained by the decedent's child. In calculating the present cash value of the plaintiff's future lost earnings, Mr. Mokyr used a formula which recognized not only the interest rates of invested money, but also included projected inflation rates and projected growth in real earnings as well. Using an average interest rate of 10.4% (based on rates for three-month Treasury bills) and a projected interest rate of 5% (based on the inflation experience of the preceding five years), Mokyr calculated an initial discount rate of 5%, which he adjusted by a 2% projected rate of growth in real earnings to determine the present value of plaintiff's future lost earnings. Mr. Mokyr testified that from an "economic point of view" the definition of present cash value includes the rate of inflation and growth of real earnings, as well as interest rates. He also indicated that, from an "economic point of view," present cash value could not be determined without consideration of all three factors.
However, on cross-examination, Mr. Mokyr acknowledged that the definition of "present cash value" set forth in IPI Civil 2d No. 34.05 was not the definition he was using. Mr. Mokyr stated that, to the contrary, the definition employed in his analysis was purely "an economic definition."
Thereafter, during the presentation of defendant's case in chief, Professor Warren Edelstein, a professor of mathematics, was called to explain the concept of present cash value to the jury. Professor Edelstein defined present cash value, stating:

*483 "Present cash value is the amount of money needed at the present to be invested to produce a prescribed amount of money at a time in the future * * * at a given rate of interest."
Professor Edelstein acknowledged that this definition did not account for the "purchasing power" of money.
Professor Edelstein illustrated the mechanics of present cash value through the use of mathematical tables which reflected the growth of investment as a function of interest rates. Utilizing these tables, he showed the jury through a series of examples how to compute the amount of money needed to produce a steady stream of income, varying the payout amount and the rate of interest. Professor Edelstein did not attempt to establish future rates of inflation or growth of real earnings, and the tables utilized by Professor Edelstein did not account for such variables. In an effort to acquaint the jury with the operation of the mathematical tables for deriving present cash value, Professor Edelstein worked through a number of hypothetical problems.
We do not agree with appellant's assertion that Professor Edelstein's definition of present cash value was improper because it did not include the rate of inflation and growth of real earnings, and find that this argument simply misapprehends the proper legal definition of present cash value. The definition of present cash value utilized by Professor Edelstein substantially mirrored the definition of present cash value set forth in IPI Civil 2d No. 34.05, which states:
"`Present cash value' means the sum of money needed now, which, together with what that sum will earn in the future, will equal the amounts of the pecuniary benefits at the times in the future when they would have been received."
The plain language of this instruction clearly does not suggest any requirement that inflation and growth of real earnings be included in the determination of present cash value. As succinctly set forth in Allendorf v. Elgin, Joliet & Eastern Ry. Co. (1956), 8 Ill.2d 164, 133 N.E.2d 288, and LeMaster v. Chicago Rock Island & Pacific R.R. (1976), 35 Ill. App.3d 1001, 343 N.E.2d 65, present cash value should be calculated by reducing the award by the amount of interest which the award would earn if invested. (See also J. Francis, Investments: Analysis & Management 191 (3d ed. 1972).) Thus, it is evident here that the definition of present cash value employed by plaintiff's expert, which included inflation and growth of real earnings as well as interest earnings, is not in accordance with the legal definition of present cash value employed by plaintiff's expert, which included inflation and growth of real earnings as well as interest earnings, is not in accordance with the legal definition of present cash value as set forth in IPI *484 Civil 2d No. 34.05 and the relevant case law.[1] (See LeMaster v. Chicago Rock Island & Pacific R.R. (1976), 35 Ill. App.3d 1001, 343 N.E.2d 65.) While in some jurisdictions the testimony of plaintiff's expert might, with proper explanation, be admissible to demonstrate to the jury the total amount of future damages, i.e., to demonstrate the effect the inflation rate and growth of real earnings would have on future earnings, it has not been the rule in Illinois.[2] (See Doca v. Marina Mercante Nicaraguense, S.A. (2nd Cir.1980), 634 F.2d 30; United States v. English (9th Cir.1975), 521 F.2d 63; Morrison v. State (Alaska 1973), 516 P.2d 402; but see Raines v. New York Central R.R. Co. (1970), 129 Ill. App.2d 294, 263 N.E.2d 895, rev'd on other grounds (1972), 51 Ill.2d 428, 283 N.E.2d 230; Prendergast v. Cox (1984), 128 Ill. App.3d 84, 470 N.E.2d 34; see also 8 Am.Jur.2d Proof of Facts sec. 1 (1976).) However, the rate of inflation, in any event, does not affect the proper formula for calculating present value. The determination of present value is simply the application of a mathematical equation to the total amount of future damages (whether future inflation rates are considered or not) reasonably expected to be experienced in the future.[3] Accordingly, we find that the trial court properly rejected plaintiff's alleged definition of present cash value as set forth by Professor Mokyr, and correctly instructed the jury in accordance with the definition of present cash value set forth in IPI Civil 2d No. 34.05.[4]
*485  3 Plaintiff further argued here that Professor Edelstein's illustration of present cash value should have been limited to "mathematical calculations from facts in evidence" rather than the use of hypothetical neutral figures. We disagree.
In LeMaster this court specifically noted that the holding in Allendorf requires an actuarial witness to testify about present cash value in terms of "neutral" figures rather than figures which are unique to the case. Therefore, in the instant case, defense counsel properly explained to the trial court, when the plaintiff's counsel objected, that Professor Edelstein was merely attempting to illustrate the mathematical process for computing present cash value. Furthermore, defense counsel during his testimony carefully refrained from allowing Professor Edelstein to use figures peculiar to the instant case in recognition of the jury's duty to determine the specific amount of damages. Defense counsel correctly told the jury that the illustrations used during the testimony of Professor Edelstein were only "examples," and that it was the jurors themselves that were to compute present cash value using whatever figures they found appropriate based on the evidence. Clearly, Professor Edelstein's use of neutral figures and hypothetical examples to illustrate the method for computing present cash value which left the ultimate computation of the award to the jury was correct and consistent with our cases.
Hence, plaintiff's assertion that Professor Edelstein's testimony should have been limited to "mathematical calculations from facts in evidence" is without any basis. Actually, the plaintiff's contention is directly contrary to what the case law in Illinois in fact requires. (See Allendorf v. Elgin, Joliet & Eastern Ry. Co. (1956), 8 Ill.2d 164, 133 *486 N.E.2d 288; LeMaster v. Chicago Rock Island & Pacific R.R. (1976), 35 Ill. App.3d 1001, 343 N.E.2d 65; Wawryszyn v. Illinois Central R.R. Co. (1956), 10 Ill. App.2d 394, 135 N.E.2d 154.) Although our cases have upheld awards where actual figures were used in the mathematical calculations, the court in each case did specifically recognize that this was not proper. See Allendorf v. Elgin, Joliet & Eastern Ry. Co. (1956), 8 Ill.2d 164, 133 N.E.2d 288; LeMaster v. Chicago Rock Island & Pacific R.R. Co. (1976), 35 Ill. App.3d 1001, 343 N.E.2d 65; Wawryszyn v. Illinois Central R.R. Co. (1956), 10 Ill. App.2d 394, 135 N.E.2d 154.
 4, 5 Also, we find no merit to plaintiff's argument that the trial court committed reversible error in allowing the present cash value annuity tables used by Professor Edelstein in evidence, and, additionally, we reject the plaintiff's related argument that it was error to allow defense counsel's handwritten mathematical computations of present cash value based on Professor Edelstein's testimony to go to the jury room. The use of present cash value tables to aid the jury's computation of present cash value was specifically approved by the Illinois Supreme Court in Allendorf and has been approved and recommended by several leading secondary authorities. (See Restatement (Second) of Torts sec. 913a, comment b, at 491 (1977).) Under Allendorf, as well as this court's decision in LeMaster, it is clear that the amortization tables were properly admitted as illustrations of the mathematical process for computing present cash value. The question of whether to allow the defendant's handwritten mathematical computation of present cash value to go to the jury is within the trial court's discretion. It is well settled that the trial court has wide discretion in determining which exhibits may be taken into the jury room, and, therefore, we will not interfere with the court's decision absent a clear abuse of its discretion. (See People v. Magby (1967), 37 Ill.2d 197, 226 N.E.2d 33; People v. Allen (1959), 17 Ill.2d 55, 160 N.E.2d 818.) Our review of the record does not indicate that the court abused its discretion under the circumstances here.
 6 Plaintiff next contends that defense counsel committed reversible error by allegedly arguing to the jury that doing a good deed as demonstrated in the Biblical parable of the Good Samaritan constitutes a legal defense to negligence. Again, we do not find the argument of the plaintiff persuasive. The record demonstrates that defense counsel did not in fact make such an argument, and the subject of the Good Samaritan was actually initially introduced and developed by plaintiff's attorney during his opening statement and closing argument.
Immediately prior to closing argument, plaintiff's counsel made a *487 motion to prohibit defense counsel from arguing what he anticipated would be an argument based on the parable of the Good Samaritan. He contended that defense counsel should be barred from asserting that the "moral law" of the parable should somehow be binding on the jury. In response to plaintiff's motion, the trial court ruled that defense counsel could talk about the parable of the Good Samaritan, but not about "Biblical law." However, the record reveals that it was plaintiff's counsel who made the first reference to the Good Samaritan parable in his closing argument. Thereafter, defense counsel, in his argument, noted to the jury that plaintiff's counsel had addressed the parable of the Good Samaritan in his opening statement to the jury. When he then summarized the parable for the jury, plaintiff's counsel again raised an objection, arguing that the law governing the case would be the law of Illinois, and not the Biblical law. The court stated that it agreed with plaintiff's counsel's argument, and admonished defense counsel, stating, "I think we are getting pretty far afield, counsel." Defense counsel concluded his argument by asserting that Larry Thompson was not negligent, but that he acted as an ordinary person would have acted if he stopped to aid a fallen man on the highway. Plaintiff's counsel objected once again, but the trial court overruled the objection, noting that plaintiff's counsel had been the one who had initially raised the subject.
We believe that a fair reading of the record here demonstrates that no error occurred by defense counsel's reference to the parable of the Good Samaritan. Contrary to plaintiff's assertion, defense counsel never suggested that the Biblical law should override the law of Illinois. In fact, far from suggesting that good deeds constituted a defense or excuse, defense counsel asked the jury to find the defendants not guilty under the legal standard of negligence by reason of the fact that the defendant, according to defense counsel, had acted as an ordinary person would have acted under the circumstances. Clearly, the fact that Larry Thompson stopped his truck for the purpose of aiding a stranded woman was arguably a factor to be considered by the jury in determining whether, in deciding to stop and the manner in which he stopped, Thompson was acting in a reasonable manner under the circumstances. Furthermore, the law is clear that broad latitude must be afforded counsel in closing argument. Tonarelli v. Gibbons (1984), 121 Ill. App.3d 1042, 1049, 460 N.E.2d 464.
 7 It is additionally important to note that the trial court did sustain plaintiff's objection to defense counsel's discussion of the parable of the Good Samaritan when defense counsel, in the court's opinion, had exceeded proper argument, and observed: "I think we are getting *488 pretty far afield, counsel." This corrective action taken by the court renders harmless, in the context of the entire trial, any error that might have arisen as a result of any such improper statements. (Carlasare v. Wilhelmi (1985), 134 Ill. App.3d 1, 479 N.E.2d 1073; Funk v. Venture Stores (1981), 94 Ill. App.3d 115, 121, 418 N.E.2d 498.) Here, it can be further said that, in any event, even if error did occur during closing argument, the error was not under the circumstances so prejudicial as to require reversal. See Carlasare v. Wilhelmi (1985), 134 Ill. App.3d 1, 479 N.E.2d 1073; Taylor v. Carborundum Co. (1969), 107 Ill. App.2d 12, 246 N.E.2d 898.
 8 Lastly, plaintiff contends that the monetary award returned by the jury in the amount of $150,000 for the wrongful death of Ruth Alsup was itself so inadequate that a new trial is required on the issue of damages. We again disagree with the plaintiff. Damages are for the jury to determine (Glover v. City of Chicago (1982), 106 Ill. App.3d 1066, 1076, 436 N.E.2d 623), and should not be disturbed on appeal unless it is shown that the verdict resulted from passion or prejudice (Cummings v. Chicago Transit Authority (1980), 86 Ill. App.3d 914, 408 N.E.2d 737), or the amount of damages shocks the judicial conscience (Lapidus v. Hahn (1983), 115 Ill. App.3d 795, 450 N.E.2d 824). If a jury is properly instructed and has a reasonable basis for its award, a reviewing court will not disturb its verdict. See Carter v. Chicago & Illinois Midland Ry. Co. (1985), 130 Ill. App.3d 431, 474 N.E.2d 458.
 9 Applying this standard to the instant case, we find that the $150,000 damage award is not so inadequate as to warrant a new trial on the issue of damages. The jury heard extensive testimony on the decedent's salary and potential for future earnings, her spending habits, and her loving and supportive relationship with her child. The jury also heard the testimony of Professor Edelstein as well as Joel Mokyr, the plaintiff's expert, concerning the present cash value of the alleged future damages. Also, the plaintiff's expert in his testimony did, in fact, admit that portions of his testimony concerning future damages were actually rather speculative. Further, there is nothing in the record to indicate the jury disregarded any proper evidence in reaching its verdict. From an examination of the record in this case, we cannot say that the jury did not have a reasonable basis for this award. While the amount of damages is not overly generous in light of the fact that the young child had lost her mother, it is nevertheless supported by the evidence, and we cannot say it is so inadequate as to shock the judicial conscience. The award of $150,000 was not so small as to be insufficient as a matter of law and should, therefore, be affirmed.
*489 For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.
Judgment affirmed.
CAMPBELL, J. concurs.
JUSTICE BUCKLEY, dissenting:
I dissent from the majority's opinion because the majority is wrong in slavishly holding that the rate of inflation should not be considered in determining damages in a wrongful death case. Moreover, the damages awarded in this case are palpably inadequate and should be reversed.
The majority concluded that defendants' definition of "present cash value" was proper simply because it followed the language of Illinois Pattern Jury Instruction, IPI Civil 2d No. 34.05. However, the majority failed to recognize the unjust paradox of this instruction. On the one hand, this instruction discounts future damages to avoid a windfall for plaintiff, because a dollar received today is almost always worth more than the same dollar received in the future. (See O'Shea v. Riverway (7th Cir.1982), 677 F.2d 1194, 1199.) On the other hand, this instruction does not consider the opposite effect the rate of inflation can have on damages. In effect, this instruction assumes a zero inflation rate with the purchasing power of the dollar remaining constant. These assumptions are completely out of touch with the reality of modern economics.
In Jones & Laughlin Steel Corp. v. Pfeifer (1983), 462 U.S. 523, 540-41, 76 L.Ed.2d 768, 785-786, 103 S.Ct. 2541, 2552-53, the United States Supreme Court recognized that in calculating future damages:
"`[T]he administrative convenience of ignoring inflation has some appeal when inflation rates are low, to ignore inflation when rates are high is to ignore economic reality.'" (462 U.S. 523, 540-41, 76 L.Ed.2d 768, 785-86, 103 S.Ct. 2541, 2552-53, quoting United States v. English (9th Cir.1975), 521 F.2d 63, 75.)
And as a renowned legal commentator has noted:
"The entire concept of reducing an award to present cash value necessarily postulates that the value of the dollar will remain intact. It would be economically inconceivable for any modern court to rule that the value of the dollar has remained or will *490 remain constant." J. Kennelly, Proof of Damages sec. 6-1, at 6-147 (Ill. Inst. for Cont. Legal Educ. 1977).
Almost all of our sister States have held that it is proper for the trier of fact to consider the effect inflation will have on the present cash value of future damages. (Rodriguez v. McDonnell Douglas Corp. (1978), 87 Cal. App.3d 626, 662, 151 Cal. Rptr. 399, 419; Bould v. Touchette (Fla. 1977), 349 So.2d 1181, 1185-86; Richmond Gas Corp. v. Reeves (1973), 158 Ind. App. 338, 369, 302 N.E.2d 795, 815-16; Ossenfort v. Associated Milk Producers, Inc. (Minn. 1977), 254 N.W.2d 672, 684; Cords v. Anderson (1977), 80 Wis.2d 525, 550-52, 259 N.W.2d 672, 683-84; see generally Annot., 21 A.L.R.4th 21 (1983) (commenting that the majority of jurisdictions permit the trier of fact to consider the effects of inflation).) Indeed, in two Illinois cases the court held that plaintiff's argument to the jury that inflation should be considered in determining the present cash value of future lost earnings was not inflammatory because it merely "stated what would appear to be obvious to the average juror." Crabtree v. St. Louis-San Francisco Ry. Co. (1980), 89 Ill. App.3d 35, 40, 411 N.E.2d 19, 23; Powers v. Illinois Central Gulf R.R. Co. (1981), 92 Ill. App.3d 1033, 1041, 416 N.E.2d 1161, 1167.
The majority opinion relies on Raines v. New York Central R.R. Co. (1970), 129 Ill. App.2d 294, 263 N.E.2d 895, rev'd on other grounds, (1972), 51 Ill.2d 428, 283 N.E.2d 230, for the proposition that under Illinois law, evidence of inflation should not be presented to the jury. Raines held that evidence of inflation should not be considered because it is too speculative and inflammatory.
The United States Supreme Court, however, has indicated that evidence of inflation is not too speculative and may properly be put before the jury. (Norfolk & Western Ry. v. Liepelt (1980), 444 U.S. 490, 494, 62 L.Ed.2d 689, 694, 100 S.Ct. 755, 757-58.) In Liepelt, the court stated that:
"[F]uture employment itself, future health, future personal expenditures, future interest rates and future inflation are also matters of estimate and prediction. Any of these issues might provide the basis for protracted expert testimony. * * * [T]he trial bar and the trial bench has developed effective methods of presenting the essential elements of an expert calculation in a form that is understandable by juries that are increasingly familiar with the complexities of modern life." (Emphasis added.)
As Liepelt recognized, given proper expert evidence the trier of fact could consider future inflation, in the same manner it considers future interest in arriving at a discount rate. The speculative nature of *491 testimony concerning future inflation is no different than the speculative nature of evidence of future interest. There is no logical reason to consider evidence of future interest without also considering evidence of future inflation. (See Jones & Laughlin Steel Corp. v. Pfeifer (1983), 462 U.S. 523, 540, 76 L.Ed.2d 768, 785, 103 S.Ct. 2541, 2552.) The rationale for excluding evidence of inflation expressed in Raines is flawed and should be abandoned.
Under the majority's view of Illinois law, the plaintiff is not being fully compensated for the present cash value of her future damages. By trying to adjust the damages calculations to avoid a windfall for the plaintiff, the court instead is bestowing a windfall on the negligent tortfeasor. This anomalous situation distorts a basic tenet of our tort system.
No matter what damages formula is used, the jury's award of $150,000 in this case is palpably inadequate. The record indicates that this award barely compensates Amy Alsup for the monetary damages (e.g., wage contributions, services) she has suffered during the 10 years since her mother's death. Moreover, this award does not compensate Amy for the damages she will suffer from the time of trial until her majority.
After all the monetary damages are subtracted from the jury's award, it wipes out the very important but intangible value of a mother/child relationship. The record in the instant case shows that Amy and her mother had a close and loving relationship. This relationship was ended at a time when Amy was no more than a two-year-old infant. During her childhood she never experienced the love, caring and affection of her mother. Furthermore, Amy will never experience her mother's guidance and understanding as she attains adulthood. For the jury to place no value on the loss of this relationship is a gross injustice.
In sum, I would reverse this case because the definition of present cash value presented to the jury was erroneous, and the damages are palpably inadequate. I would remand this case for a proper determination of the damages.
NOTES
[1] Although Mr. John J. Kennelly in his treatise on Proofs of Damages (J. Kennelly, Proofs of Damages sec. 6.1 (Ill. Inst. for Cont. Legal Educ. 1977) argues that the effect of inflation in reducing the purchasing power of money in the future should be taken into account in wrongful death cases, he does recognize that such inflationary trends are not admissible in Illinois. J. Kennelly, Proofs of Damages sec. 6-1, at 6-147 (Ill. Inst. for Cont. Legal Educ. 1977).) Compare the extreme situation endorsed in Ruff v. Weintraub (1987), 105 N.J. 233, 519 A.2d 1384, where the New Jersey Supreme Court held that the proper measure of damages for lost future income in a wrongful death case was plaintiff's net income after taxes. Thus, evidence concerning the plaintiff's future tax liability was properly admissible.
[2] Some Illinois courts have held that this evidence may not require reversal where there is other proper evidence sufficient to support the verdict (Raines v. New York Central R.R. Co. (1970), 51 Ill.2d 428, 283 N.E.2d 230; Twait v. Olson (1982), 104 Ill. App.3d 191, 432 N.E.2d 1244; Powers v. Illinois Central Gulf R.R. Co. (1981), 92 Ill. App.3d 1033, 416 N.E.2d 1161, aff'd in part and rev'd in part on other grounds (1982), 91 Ill.2d 375, 438 N.E.2d 152; Crabtree v. St. Louis-San Francisco Ry. Co. (1980), 89 Ill. App.3d 35, 411 N.E.2d 19; Kapelski v. Alton & Southern R.R. (1976), 36 Ill. App.3d 37, 343 N.E.2d 207). It appears, on the other hand, that Illinois courts still have never specifically approved the interjection of future inflationary trends as a proper matter for consideration by the trier of fact in rendering an award of damages for future losses. See Annot., 21 A.L.R.4th 21, 42 (1983); Prendergast v. Cox (1984), 128 Ill. App.3d 84, 470 N.E.2d 34.
[3] The time value of money can be represented symbolically. Let vt represent the terminal value of money at the end of time period t, p represent the present value, and r[o][n] represent the interest rate per period which may be earned on money that is saved for n periods starting at time t = 0, that is, the present time. The formula may then be stated as:
 P[o](1 + r[o][1])[1] = V[1]

This equation is only a "one period" formula. If money is invested and left for n period, then the equation is as follows:
 P[o](1 + r[o][n])[n] = V[n]
For a more detailed explanation of present value, see J. Francis, Investments: Analysis & Management (3d ed. 1972); C. Goetz, Law & Economics 158-60 (1984).
[4] See McCrann v. United States Lines, Inc. (2nd Cir.1986), 803 F.2d 771, where Judge Irving R. Kaufman sets forth an excellent review of the basic concepts involved in calculating the present value of damage awards for lost wages in personal injury trials.